**DYEGARD LAND PARTNERSHIP,**
Appellant,

v.

**Robert L. HOOVER, Jr., Jackie Hoover, Donald Tye, and Cynthia Tye, Appellees.**

No. 2–99–361–CV.

Court of Appeals of Texas,
Fort Worth.

Jan. 11, 2001.

Bourland, Kirkman, Seidler; Thomas M. Michel, Fort Worth, Attorney for Appellant.

Delfeld & Telford, PLLC; Randal L. Telford, Springtown, Attorney for Appellee.

PANEL A: CAYCE, C.J.; DAUPHINOT and GARDNER, JJ.

## OPINION

GARDNER, Justice.

Owners of lots in a rural, residential subdivision sued the developer for a declaratory judgment that restrictive covenants applicable to their lots did not prohibit drilling wells for water. The developer appeals from a summary judgment in favor of the lot owners, contending that amended covenants, which it unilaterally executed and filed after the dispute arose, expressly prohibit the proposed water wells. Alternatively, the developer contends that the original covenants on file when the lots were purchased prohibit the proposed water wells. We affirm in part and reverse and remand in part.

## STATEMENT OF FACTS

### 1. The Original Covenants

In May 1994, Appellant Dyegard Land Partnership obtained approval of a plat and filed deed restrictions for Oak View Estates, a single-family residential subdivision in rural Parker County, Texas. In October 1994, Dyegard filed "Covenants, Conditions and Restrictions" ("original covenants") applicable to the subdivision in the records of the county clerk of Parker County, Texas. By the original covenants, Dyegard adopted a plan for subdivision of the tract described on the plat and impressed upon the property some thirty-eight restrictive covenants, "which shall run with the title to said land and shall be binding upon all parties and persons claiming said land or any part thereof until December 21, 2015, at which time said covenants shall be automatically extended in successive periods of (10) years, unless by agreement [of] a majority of the owners of the lots comprising said subdivision it is then agreed to change said covenants in whole or in part."

The original covenants provided for an architectural control committee, limited the use of lots to single family residences with living areas of at least 3,000 square feet, and prescribed numerous, specific building restrictions including: a requirement for wood shingle or 240 pound composition roofs; a prohibition against flat roofs; limitation of building materials to stone, masonry, brick, or glass; a prohibition of television or other antennae exceeding thirty feet in height; a requirement that mailboxes be of materials matching

the residence; a requirement that garage doors open to the rear or side of the house, with all garage doors to be equipped with automatic garage door openers; and a requirement for curtains on garage windows to screen cars and equipment from outside view.

The original covenants also prohibited a number of activities on the lots, including use or discharge of firearms; keeping of chickens, hogs, goats, horses or any animals other than dogs or cats or other pets (specifically requiring vaccination and records to be kept of pets' vaccinations); and a prohibition of commercial activities for any purpose whatsoever. Covenant Number 18 of the original covenants provided:

> (18) No drilling, development, refining, quarrying, mining or prospecting for minerals of any kind shall be permitted on any lot, nor shall any wells, tanks, tunnels, mineral excavations or shafts be permitted to remain thereon. No derrick or other structure designed for use in boring for any minerals shall be erected, maintained or permitted to remain on any lot.

## 2. Water Problems

Appellees Robert and Jackie Hoover purchased a lot in Oak View Estates in August 1997. Appellees Donald and Cynthia Tye purchased a lot in the subdivision in the same month. All of the Appellees purchased their lots with notice of and reliance on the original covenants. Their lots were made subject to the original covenants as provided in the deeds for both lots. Their homes were constructed on the lots they purchased and conformed to the original covenants.

As part of the plan for developing Oak View Estates, Dyegard installed water lines and provided water to the subdivision from a related company, Dyegard Water Company. During the summer months of 1997, however, Appellees began experiencing problems with quantity, volume, and pressure of the water they were being provided and investigated the possibility of drilling water wells on their respective lots.

On August 5, 1998, Robert Hoover requested permission from Dyegard to put a private water well on his lot. Dyegard denied permission and hired an attorney who wrote the Hoovers on August 12, 1998, advising them that the restrictions on their property were "very clear" and, specifically, that Covenant Number 18 of the original covenants prevented drilling "any well, water, mineral or otherwise." Dyegard's attorney threatened to seek an injunction if the Hoovers did not immediately cease any action to drill a water well.

## 3. The Amended Covenants

In addition to the provision allowing amendment of the original covenants by a majority of the lot owners at the end of the stated period ending December 21, 2015, Covenant Number 37 provided that any term or provision of the restrictions regarding improvements and use of lots "may be amended by an instrument in writing, duly executed and acknowledged by the owners owning not less than ninety percent of all the lots to which they are applicable." In still another provision, the instrument setting forth the covenants and restrictions stated, "The Developer further reserves the right to alter or amend these restrictions in writing and which alteration or amendment when duly recorded shall be binding upon all owners of all lots shown on said plat." On August 31, 1998, Dyegard executed and filed of record "Amended Covenants, Conditions and Restrictions" ("amended covenants"). The amended covenants changed Covenant Number 18 to provide:

> (18) No drilling, development, refining, quarrying, mining or prospecting for minerals of any kind *or water* shall be permitted on any Lot, nor shall any wells, tanks, tunnels, mineral excavations or shafts be permitted to remain thereon. No der-

rick or other structure designed for use in boring for any minerals shall be erected, maintained or permitted to remain on any Lot. *No individual water-supply system or any personal water well shall be permitted on any Lot.* [Emphasis added].

In early December of 1998, counsel for Dyegard sent copies of the amended covenants to all of the homeowners in the subdivision. On December 12, 1998, he forwarded a copy of the amended covenants to Appellees' attorney.

### 4. Procedural Background

Appellees responded by filing suit for a declaratory judgment, requesting the court to declare that the "Covenants, Conditions and Restrictions applicable to the lots owned by [Appellees] in Oak View Estates, do not prohibit [them] drilling a water well on their property." After filing suit, Appellees moved for summary judgment against Dyegard on their "entire cause of action," asserting that "the Covenants, Conditions and Restrictions filed of record at the time that [Appellees] purchased their residential real estate lots do not prohibit [Appellees] from drilling a water well on their real property owned in OAK VIEW ESTATES PHASE I."

Appellees' motion further asserted that their affidavits, their deeds, and the original as well as the amended covenants, established that they purchased their lots in 1997 while the original covenants were filed of record; that the original covenants "are the restrictions that effects [sic] the lots [Appellees] purchased;" and that Dyegard "attempted to unilaterally amend" those original covenants by filing the Covenants, Conditions and Restrictions on August 31, 1998, evidencing Dyegard's attempt to prohibit Appellees from drilling a water well on their respective property. Therefore, Appellees asserted the summary judgment evidence conclusively

showed that there are no genuine issues of material fact regarding their right to drill a water well on their property without interference from Dyegard, entitling them to judgment as a matter of law.

Dyegard filed a written response, objecting to statements in Appellees' affidavits as conclusory and to the use of requests for admissions to Dyegard as improper summary judgment evidence and raising two substantive issues: (1) that the motion should be denied because the original covenants were amended to provide specifically that water wells were prohibited, pursuant to the provision reserving Dyegard's right to amend or alter the covenants; and, (2) in the alternative, that the original covenants prohibited the drilling of water wells by Appellees.

Following a hearing, the trial court signed a Final Summary Judgment overruling Dyegard's objections to Appellees' summary judgment evidence, granting Appellees' motion for summary judgment, and specifically declaring:

> IT IS FURTHER ORDERED that the Covenants, Conditions and Restrictions of Oak View Estates filed of record in the Parker County Clerk Real Property Records do not prohibit [Appellees] from drilling an individual private water well on [Appellees'] lots within the subdivision, Oak View Estates.
>
> IT IS FURTHER ORDERED that the Covenants, Conditions and Restrictions do prohibit [Appellees] from drilling a water well for service to more than a single residence.
>
> IT IS FURTHER ORDERED that the Covenants, Conditions and Restrictions prohibit [Appellees] from drilling a water well for the distribution to other property owners in Oak View Estates.[1]

---

1. The trial court's order also awarded to Appellees $3,500 in attorney's fees with interest, $4,000 additional attorney's fees in the event

Dyegard appealed to the court of appeals, and another $4,000 in attorney's fees in the event Dyegard appealed to the supreme court.

## STANDARD OF REVIEW

We review a summary judgment under well-established rules. The movant has the burden to show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). The evidence is viewed in the light most favorable to the nonmovant, indulging all reasonable inferences in its favor and resolving all doubts against the movant. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action as a matter of law. *Clear Creek Basin Auth.,* 589 S.W.2d at 678.

A plaintiff moving for summary judgment must prove entitlement to summary judgment on each element of the plaintiff's cause of action. *Martin v. Palmer,* 1 S.W.3d 875, 876 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). Once the movant has established a right to summary judgment, the burden shifts to the nonmovant. *Peterson v. Continental Cas. Co.,* 997 S.W.2d 893, 895 (Tex.App.—Houston [1st Dist.] 1999, no pet.). The nonmovant must then respond and present any issues that would preclude summary judgment for the movant. *Id.* (citing *Clear Creek Basin Auth.,* 589 S.W.2d at 678). A defendant relying upon an affirmative defense must then come forward with evidence raising a fact issue on each element of its affirmative defense in order to avoid the summary judgment on that basis. *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *Bauer v. Jasso,* 946 S.W.2d 552, 555 (Tex.App.—Corpus Christi 1997, no pet.).

## DISCUSSION

The issues presented by Dyegard on appeal are: (1) whether the trial court erred in granting Appellees' motion for summary judgment on a ground not expressly presented by the motion; (2) whether the summary judgment was erroneous because the original covenants clearly prohibited drilling water wells; (3) whether the summary judgment was erroneous because the amended covenants were enforceable and clarified the original covenants to prohibit water wells; and (4) whether the trial court erred in overruling Dyegard's objections to Appellees' summary judgment evidence. We address the issues in the order in which they have been raised by Dyegard.

### I. Grounds Presented by Motion

Dyegard first complains that the summary judgment is improperly based on the ground that the provision reserving Dyegard's right to amend the original covenants is unenforceable. Dyegard asserts that this ground was not stated by Appellees in their motion for summary judgment. Dyegard is correct in asserting that a motion for summary judgment must state the specific grounds upon which it is based. *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993).

A motion for summary judgment must stand or fall on the grounds expressly presented in the motion. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996) (stating appellate court considers only those grounds the movant actually presented to trial court); *McConnell,* 858 S.W.2d at 341. Simply stated, a summary judgment cannot be affirmed on grounds never presented to the trial court by the motion. Tex.R. Civ. P. 166a(c) ("The motion ... shall state the specific grounds therefor."); *McConnell,* 858 S.W.2d at 341; *Cadenhead v. Hatcher,* 13 S.W.3d 861, 863 (Tex.App.—Fort Worth 2000, no pet.).[2]

---

2. Stated differently, a trial court cannot grant more relief than was requested by a motion for summary judgment. *Science Spectrum, Inc.,* 941 S.W.2d at 912. A trial court errs in

Dyegard contends "unenforceability" of a contract provision is an affirmative defense Appellees were required to plead and raise in reply to Dyegard's assertion in its own response that the amended covenants precluded Appellees' right to drill the water wells. Dyegard asserts it is uncontroverted that the amended covenants clearly prohibit drilling of water wells; hence, it argues, the "only way" the trial court could have determined that Appellees were entitled to prevail in the face of the amended covenants was to conclude that the provision in the original covenants reserving Dyegard's right to amend those covenants is unenforceable.

■ We cannot ascertain the grounds upon which the trial court granted the motion from the order because the order does not specify the grounds upon which it was granted.[3] Dyegard asserts that the record of the hearing on the motion shows that the trial court did, in fact, conclude that the provision reserving Dyegard's right to amend was unenforceable. However, it is inappropriate for us to consider the record of the summary judgment hearing to determine the reasoning of the trial court. *Clear Creek Basin Auth.*, 589 S.W.2d at 677 (stating record of summary judgment hearing not appropriate for consideration on appeal); *Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 872 (Tex. App.—San Antonio 1997, no writ) (same). Nevertheless, we agree that because the amended covenants clearly prohibit drilling water wells and were before the trial court, the order granting summary judgment necessarily includes a determination

that the amended covenants were unenforceable.

■ In their motion, Appellees expressly requested a summary judgment declaring that the original covenants filed of record at the time they purchased their lots did not prohibit the drilling of water wells. However, Dyegard acknowledges that Appellees did not merely request a summary judgment on that basis but proceeded "with a broader request," asserting that they owned their lots before Dyegard "unilaterally attempted" to amend the original covenants in August 1998 to prohibit them from drilling. Appellees also put the amended covenants before the court as exhibits attached to their motion. Dyegard acknowledges that, "[a]s such, Appellees sought a judgment that Dyegard could not prohibit [Appellees] from drilling a water well."

■ In our opinion, the motion was sufficiently broad to present grounds asserting that the amended covenants were unenforceable as an improper unilateral attempt to amend. The purpose of the specificity requirement in Rule 166a(c) is to provide the nonmovant with adequate information to oppose the motion and to define the issues. Tex.R. Civ. P. 166a(c); *Westchester Fire Ins. Co. v. Alvarez*, 576 S.W.2d 771, 772 (Tex.1978). This requirement echoes the "fair notice" pleading requirement of rule 45(b) and 47(a) of the Texas Rules of Civil Procedure. Tex.R. Civ. P. 45(b), 47(a); *Alvarez*, 576 S.W.2d at 772–73; Timothy Patton, Summary Judgments in Texas, § 3.05 (1995).[4]

---

granting more relief than was requested by disposing of issues never presented to it in the motion for summary judgment. *Inglish v. Union State Bank*, 945 S.W.2d 810, 811 (Tex. 1997).

3. The order is entitled "Final Summary Judgment," and may be reviewed and affirmed on any ground properly presented, regardless of whether the trial court specified the ground in its order. *Cincinnati Life Ins.*, 927 S.W.2d at 625.

4. The grounds presented are, at worst, unclear from the motion. Where the movant's grounds are unclear or ambiguous, it is incumbent upon the nonmovant to specially except to the motion for summary judgment. *McConnell*, 858 S.W.2d at 342; *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 175 (Tex.1995). Dyegard did not except, and thus lost its right to have the grounds narrowly focused. *McConnell*, 858 S.W.2d at 342–43.

Moreover, we believe Dyegard is resisting Appellees' motion for summary judgment by attempting to raise an affirmative defense; that is, Appellees sought summary judgment based upon the original restrictive covenants as the controlling contractual terms, and Dyegard interposed the defense of amendment, which is embraced by the theory of modification of the original contract. *Enserch Corp. v. Rebich*, 925 S.W.2d 75, 83 (Tex.App.—Tyler 1996, writ dism'd by agr.) "Modification" is an affirmative defense. *Brownlee*, 665 S.W.2d at 112; *Metrocon Constr. Co. v. Gregory Constr. Co.*, 663 S.W.2d 460, 463 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). A defendant resisting a plaintiff's motion for summary judgment by asserting an affirmative defense must present summary judgment evidence sufficient to raise an issue of fact on each element of that defense. *Enserch*, 925 S.W.2d at 81 (holding defendant had burden to raise issue of fact on affirmative defense of modification); *Brownlee*, 665 S.W.2d at 112 (same).

Additionally, in a declaratory judgment action in which the defendant seeks to enforce a restrictive covenant, the defendant retains the burden of proof to establish that the necessary legal steps have been taken to render such restrictions effective, binding, and mutually enforceable. *McCart v. Cain*, 416 S.W.2d 463, 465 (Tex.Civ.App.—Fort Worth 1967, writ ref'd n.r.e.). Based on the foregoing, we hold that Dyegard, rather than Appellees, had the burden to raise the issue of the validity and enforceability of the amended covenants and had the burden to come forward with evidence to establish both its right to amend and its compliance with the legal steps to amend the covenants so as to prohibit Appellees' proposed water wells. Dyegard, itself, expressly raised the issue of the enforceability of the amended covenants in its response to the motion. Accordingly, the order granting the summary judgment was properly based on grounds raised by both the motion and response.

## II. The Original Covenants

Dyegard contends that, without regard to consideration of the amended covenants, the prohibition against drilling for "minerals of any kind" in original Covenant Number 18 clearly precluded drilling for water because water is a mineral. Conversely, Appellees' position is that the ordinary and generally accepted meaning of the term "minerals" does not include water. Appellees further argue that the original covenant is clearly intended only to prevent the development of oil, gas, coal, or other commercially extracted minerals and that the original covenant does not preclude the drilling of private water wells.

### Rules Governing Interpretation of Restrictive Covenants

Restrictive covenants are subject to general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998). In construing a restrictive covenant, the court's primary task is to determine the intent of its framers. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex.1987). Covenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are *clearly worded*, they will be enforced. *Simon Prop. Group (Tex.) L.P. v. May Dep't Stores Co.*, 943 S.W.2d 64, 71 (Tex.App.—Corpus Christi 1997, no writ) (citing *Wilmoth*, 734 S.W.2d at 657). Words used in a restrictive covenant may not be enlarged, extended, stretched, or changed by construction. *Wilmoth*, 734 S.W.2d at 657; *Pebble Beach Prop. Owners' Ass'n v. Sherer*, 2 S.W.3d 283, 288 (Tex.App.—San Antonio 1999, pet. denied). Rather, words and phrases used in the covenant must be given their commonly accepted meaning. *Wilmoth*, 734 S.W.2d at 657.

Common law principles specifically applicable to restrictive covenants, as set forth and reaffirmed by the supreme court in *Wilmoth*, require that all doubts be resolved in favor of the free and unre-

stricted use of the premises and that any ambiguity in a restrictive covenant be strictly construed against the party seeking to enforce the covenant. 734 S.W.2d at 657; *Highlands Mgmt. Co. v. First Interstate Bank,* 956 S.W.2d 749, 753 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Munson v. Milton,* 948 S.W.2d 813, 816 (Tex.App.—San Antonio 1997, writ denied); *see also Silver Spur Addition Homeowners v. Clarksville Seniors Apartments,* 848 S.W.2d 772, 774 (Tex.App.—Texarkana 1993, writ denied) (holding doubts must be resolved in favor of least restrictive interpretation).

■ In language that might be perceived as contradictory to these long-established rules, the Texas legislature has provided that "[a] restrictive covenant shall be liberally construed to give effect to its purposes and intent." TEX. PROP.CODE. ANN. § 202.003(a) (Vernon 1995). This statutory rule of construction was added to the Texas Property Code in 1987. Act of May 23, 1987, 70th Leg., R.S., ch. 712, § 1, 1987 Tex. Gen. Laws 2585, 2585; *see also Highlands Mgmt. Co.,* 956 S.W.2d at 753 (noting that statute applies to all restrictive covenants). Dyegard does not contend, nor do we believe, that this statute trumps the common law rules of construction. Neither the supreme court nor the majority of courts of appeals has discerned any intent by the legislature, in adopting section 202.003(a) of the property code, to overturn the established common law rules of construction.[5]

In *Ashcreek Homeowner's Ass'n v. Smith,* the First Court of Appeals was unable to discern a conflict between section 202.003(a) and the common law *Wil-*

*moth* principles and further observed that *Wilmoth* was decided by the supreme court *after* section 202.003(a) was enacted.[6] 902 S.W.2d 586, 588–89 (Tex.App.—Houston [1st Dist.] 1995, no writ). In 1998, the supreme court noted, but chose not to address the argument made to it, that the legislature intended section 202.003(a) to overturn the common law rules of interpretation. *Pilarcik,* 966 S.W.2d at 478. Because we likewise discern no conflict with section 202.003(a), we will apply the common law rules of construction.

### Application of Rules to Original Covenant

■ Neither party asserts that the original covenant prohibiting drilling wells for "minerals" is ambiguous. Nevertheless, we first consider whether the original covenant may be ambiguous because Dyegard sought to have an affidavit of one of its partners considered as summary judgment evidence as to the developer's intent regarding the meaning of the term "minerals" in the original covenants. Although the parties assert contrary interpretations, mere disagreement over the interpretation of a provision does not make it ambiguous. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981); *Hodas v. Scenic Oaks Prop. Ass'n,* 21 S.W.3d 524, 528 (Tex. App.—San Antonio 2000, no pet.) (interpreting a restrictive covenant). If a word or phrase can be interpreted to give it a definite or certain meaning, then it is not ambiguous but can be construed as a matter of law, giving effect to the intent of the drafter as expressed in the instrument. *City of Pinehurst v. Spooner Addition*

---

5. *E.g., Highlands Mgmt. Co.,* 956 S.W.2d at 749 (holding that common law rules did not mandate reversal, but not disagreeing with *Wilmoth*); *Munson,* 948 S.W.2d at 816 (applying strict construction in favor of free and unrestricted use where there is ambiguity or doubt as to intent); *Simon Prop. Group,* 943 S.W.2d at 71 (holding existence of section 202.003(a) does not preclude consideration of long-standing principles favoring free and unrestricted use of land).

6. *But see Benard v. Humble,* 990 S.W.2d 929, 930 (Tex.App.—Beaumont 1999, pet. denied) (giving priority to rule of liberal construction set forth in property code over common law rules); *Candlelight Hills Civic Ass'n v. Goodwin,* 763 S.W.2d 474, 477, 480 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (construing property code rule of construction as mandate in lieu of common law rules).

*Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Hodas*, 21 S.W.3d at 528; *Highlands Mgmt. Co.*, 956 S.W.2d at 756.

■ Giving the term "minerals" and the language of the covenant their plain and ordinary meaning, we conclude that the covenant is not ambiguous but can be interpreted to give it a definite and certain meaning not including water as a matter of law, based on prior judicial interpretation as well as the separate treatment of minerals and water by both courts and the legislature in Texas for many years. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983).[7]

In *Fleming Foundation v. Texaco, Inc.*, the term "minerals" was given a judicial definition based on its natural and ordinary meaning that, as a matter of law, excludes water. 337 S.W.2d 846, 851–52 (Tex.Civ.App.—Amarillo 1960, writ ref'd n.r.e.). Both sides cite *Fleming* for their respective positions. Dyegard relies upon an isolated statement in the opinion in *Fleming* that water is "technically" a mineral. *Id.* at 852. That statement, however, is taken out of context. The court in *Fleming* merely acknowledged in the course of its opinion that there is no doubt that water is "technically" a mineral. *Id.* But the holding of the decision is that the reservation in a deed of an interest in oil, gas, and "other minerals" does *not* include water. *Id.* We agree with the Amarillo court in *Fleming* as to the meaning of the term "minerals" and hold that its definition of "mineral" as excluding water is applicable in this case.

Dyegard attempts to distinguish *Fleming* because that case involved a conveyance deed severing the surface estate from the mineral estate, but this case involves a general prohibition against drilling wells on property in the subdivision. Dyegard points out that, in the course of its analysis, the court in *Fleming* applied the max-

im of *ejusdem generis*, concluding that water is not a "like thing" to oil and gas and that the *Fleming* court looked to the oil and gas industry's understanding to determine that water was not intended to be included as a mineral in the conveyance in that case.

Those are differences without a distinction. The fact remains that the ultimate holding in *Fleming* was based on the long-established rule that mineral rights "are to be interpreted according to their ordinary and natural meaning where there is no manifestation of an intention expressed in the deed to use them in a scientific or technical sense," rather than on the peculiarities of oil and gas conveyances. *Id.* Furthermore, the *Fleming* court followed *Heinatz v. Allen*, which did not involve oil and gas. 147 Tex. 512, 217 S.W.2d 994 (1949).

In *Heinatz*, the supreme court applied the established rule of interpretation that the words "mineral" and "minerals" are to be understood as used in their ordinary and natural meaning absent a "clear indication" that they are intended to have a more or a less extended meaning and held that a devise of "mineral rights" in a will did not include rights to limestone. *Id.* Although the petitioners in *Heinatz* cited references classifying limestone as a mineral, the court rejected that classification because it was based upon the scientific or technical definition of the word "minerals." *Id.* at 996.

The supreme court noted that it is "rare, if ever" that the term "mineral" is intended in the scientific or technical sense. *Id.* at 997. The court in *Heinatz* further reasoned that, if the scientific definition of minerals was followed, even the caliche dirt composing a large part of the surface could also be considered a mineral. *Id.* It recognized that "the scientific or technical

---

7. Because we conclude that the covenant is not ambiguous, we will not consider Dyegard's affidavit as to its subjective intent regarding the covenant. *718 Assocs., Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 365–66 (Tex.App.—Waco 1999, pet. denied); *Webster v. U.S. Fire Ins. Co.*, 882 S.W.2d 569, 572 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

definition of minerals is so broad as to embrace not only metallic minerals, oil, gas, stone, sand, gravel, and many other substances, but even the soil itself." *Id.*

■ Materials not "rare" and "exceptional" in character and that are so closely related to the surface itself that they are reasonably and ordinarily considered a part of the soil belonging to the surface estate are not "minerals" within the ordinary meaning of the word. *Atwood v. Rodman,* 355 S.W.2d 206, 215 (Tex.Civ. App.—El Paso 1962, writ ref'd n.r.e.). Texas courts have also long considered water as part of the soil itself.[8] In *Houston & T.C. Ry. Co. v. East,* the supreme court held that the owner of land is the "absolute" owner of the soil and of the percolating water, which it described as "part of, and not different from, the soil." 98 Tex. 146, 81 S.W. 279, 281 (1904) (adopting English rule of "absolute ownership" of underground water by the surface owner of land); *see also Friendswood Dev. Co. v. Smith–Southwest Indus., Inc.,* 576 S.W.2d 21, 30 (Tex.1978) (noting "ownership of underground water comes with ownership of the surface; it is part of the soil").

The supreme court in *Gifford–Hill & Co. v. Wise County Appraisal District,* also relied upon *Heinatz* in considering whether limestone reserves were "minerals" for ad valorem tax purposes. 827 S.W.2d 811, 814 (Tex.1991). The court held that, while there was no legislative definition of "mineral" in the tax code, a particular meaning has been acquired by judicial definition and that the ordinary and natural meaning of the term, as defined in *Heinatz,* does not include limestone. *Id.* at 815. *Heinatz* and *Gifford–Hill* clearly demonstrate that the judicial definition of minerals as excluding water adopted in *Fleming,* as well as the rules of construction applied in reaching that decision, may be applied to conveyances other than those involving

only surface and mineral rights in the context of the oil and gas industry.

Although cited by neither party, the Texas Property Code provides a legislative definition of the term "mineral," essentially incorporating the *Heinatz* and *Fleming* analysis, mandating the use of the meaning of the term in its ordinary and natural sense. "Mineral" means oil, gas, uranium, sulphur, lignite, coal and any other substance that is ordinarily and naturally considered a mineral in this state, regardless of the depth at which the oil, gas, uranium, sulphur, lignite, coal or other substance is found. TEX. PROP.CODE ANN. § 75.001(a)(1) (Vernon 1995).

The property code definition of "minerals" is not limited to conveyances in the context of oil and gas nor to cases involving severance of the surface ownership from the minerals. *Id.* Significantly, the statutory definition does not list water as a mineral.

That underground water is not ordinarily and naturally considered a mineral in this state is further supported by the difference between the way underground water has been dealt with by Texas law and the manner in which Texas law has addressed oil and gas and other minerals. At an early date, the legislature adopted regulatory control provisions for conservation and prevention of waste as well as protection of correlative rights regarding oil and gas. *Brown v. Humble Oil & Refining Co.,* 126 Tex. 296, 83 S.W.2d 935, 938–39 (1935) (tracing history and development of regulatory control and vesting of authority for the oil and gas industry's regulation in railroad commission). Laws pertaining to underground water developed entirely separately from oil and gas law. *Friendswood,* 576 S.W.2d at 26–27, 29. The legislature did not enter the field of regulation of groundwater until the adoption of the Texas Underground Water Conservation Act in 1949, which created districts for conservation and prevention of

---

8. Sand and gravel, like limestone, have been held not to constitute "minerals." *Psencik v.* *Wessels,* 205 S.W.2d 658, 659 (Tex.Civ.App.— Austin 1947, writ ref'd).

waste. *Id.* at n. 13 (citing Act of May 19, 1949, 51st Leg., R.S., ch. 306, § 1, 1949 Tex. Gen. Laws 559, 559). In 1973, the legislature added subsidence. *Id.* at n. 14 (citing Act of May 24, 1973, 63rd Leg., R.S., ch. 598, § 1, 1973 Tex. Gen. Laws 1641, 1641).[9]

Legislation regulating water, including groundwater, is now found in the Texas Water Code. In contrast, legislation governing oil, gas, and other minerals is collected in the Texas Natural Resources Code. The differences between the law governing underground water and that governing oil, gas and other minerals are now so intricately woven into the fabric of Texas jurisprudence as to constitute a backdrop against which this issue must be viewed, precluding underground water . ·m being considered as included in the · ·n "minerals."

 yegard also argues that the phrase "an·y well" in the original covenant is not limited to wells for minerals, so that the original covenant must nevertheless be read as precluding the drilling of any well, including one for water. We disagree. The covenant is not so broadly written as Dyegard claims, but expressly ties the prohibition to drilling "for minerals of any kind." The phrase "any wells" is actually contained in the next sentence, which prohibits any wells, tanks, tunnels, mineral excavations, or shafts to "remain" on the lots, implying that the wells referred to are those resulting from the drilling activi-

ties for minerals as listed in the preceding sentence.

Moreover, the term "drilling" does not stand alone, but is one of several specific activities prohibited, including "development, refining, quarrying, mining or prospecting." As argued by Appellees, oil, gas, and coal are developed, but water is not. Oil and gas are refined, but water is not. Substances such as limestone are quarried, but water is not. Minerals such as gold, silver and coal are mined, but water is not. We agree with Appellees that the specific listing of development, refining, quarrying, mining, and prospecting, along with drilling, indicates that the purpose of the covenant was to prevent activities associated with extraction of oil and gas and other substances ordinarily viewed as minerals in this state, not water.[10]

The other original restrictive covenants applicable to Oak View Estates are so specific as to prohibit goats and to require curtains for garage windows. With such specificity running throughout the covenants, we cannot accept Dyegard's argument that Covenant Number 18 is uniquely intended to be read so broadly as to encompass an activity nowhere listed. In accordance with the rules of construction applicable to restrictive covenants, any doubt to that effect must be resolved against Dyegard.

When the terms of the original covenants are read as a whole and in light of

9. In contrast to underground water, surface water, including flood waters and navigable streams, with the attendant issue of riparian rights, has been the subject of Texas laws since before Texas independence. *E.g., Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458, 463 (1926) (tracing origin of riparian rights from time of Mexican colonization law of 1823 requiring Stephen F. Austin to distinguish between lands that might be irrigated in colonization grants).

10. The only case we have found involving an alleged violation of a restrictive covenant by the drilling of a water well is *Griffith v. Pecan Plantation Owners Ass'n,* in which this court affirmed a summary judgment against lot owners who drilled a water well in violation

of a restrictive covenant that specifically provided:

> *No water wells shall be drilled* upon any lot so long as water for domestic use shall otherwise be available to the owners of said lots, but nothing herein shall be construed to prohibit Dedicator ... from drilling and equipping a well ... for the purpose of supplying water to the owners of any lots.

667 S.W.2d 626, 627 (Tex.App.—Fort Worth 1984, no writ) (emphasis added).

That 1984 decision provides a specific example of a clear expression of intent to prohibit the drilling of water wells, in stark contrast to Covenant Number 18 of the original covenants at issue in this case.

their purpose as carrying out the plan for this *rural subdivision* bordering on the plains of West Texas, we find no clearly worded intent expressed to prohibit drilling of water wells. We hold, as a matter of law, that Appellees were not prohibited by Covenant Number 18 of the original covenants from drilling water wells on their lots for personal use. We overrule Dyegard's second issue.

### III. The Amended Covenants

Dyegard next contends that, in the event this Court decides that the original covenants did not prevent Appellees from drilling water wells, the amended covenants "clarified" its intent to prohibit water wells within the subdivision. Dyegard points out that it is undisputed that amended Covenant Number 18 expressly prohibits any "individual water supply system or any personal water well." Dyegard contends that unilateral adoption of the amended covenants was valid pursuant to the provision in the original covenants reserving Dyegard's right to amend. Appellees contend that Dyegard was not authorized to unilaterally adopt the amendments by the reservation of the right to amend provided in the original covenants because the amendment provision did not require, and Dyegard did not obtain, concurrence of the property owners for the amendment. Appellees also contend that the provision reserving the right to amend was insufficient to authorize any amendment because it did not provide for a method of amendment.

Generally, landowners have the unilateral or "ex parte" right in the first instance to impose any restrictions they choose, to alter or cancel restrictions, or to abrogate them in their entirety, so long as no lots in a subdivision have been sold. *E.g., Hill v. Trigg,* 286 S.W. 182, 183 (Tex. Comm'n App.1926, judgm't adopted); *Parker v. Delcoure,* 455 S.W.2d 339, 343 (Tex. Civ.App.—Fort Worth 1970, writ ref'd n.r.e.); *see also Scoville v. SpringPark Homeowner's Ass'n, Inc.,* 784 S.W.2d 498,

507 n. 5 (Tex.App.—Dallas 1990, writ denied) (Ovard, J., dissenting) (noting provision allowing developer to amend or alter Master Dedication until such time as first portion of lots sold was in accord with well settled rule).

The summary judgment evidence here reflects that at least some lots have been sold. Under these circumstances, power to amend restrictions may nevertheless continue to be reserved in the developer, but any amendment must then be in the exact manner as provided in the dedication. *Norwood v. Davis,* 345 S.W.2d 944, 948 (Tex.Civ.App.—Austin 1961, no writ). It is well settled that authority to amend requires three conditions to be met. First, the instrument creating the original restrictions must establish both the right to amend and the method of amendment. *Scoville,* 784 S.W.2d at 504; *Hanchett v. East Sunnyside Civic League,* 696 S.W.2d 613, 615 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) (citing *Couch v. Southern Methodist Univ.,* 10 S.W.2d 973, 974 (Tex. Comm'n App.1928, judgm't adopted)). Second, the right to amend implies only those changes contemplating a correction, improvement, or reformation of the agreement rather than a complete destruction of it. *Hanchett,* 696 S.W.2d at 615. Third, the amendment must not be illegal or against public policy. *Id.*

With respect to Appellees' argument that the instrument did not authorize unilateral amendments, Appellees emphasize case law stating that authority to amend generally requires "concurrence" of lot owners. *Id.* (recognizing general rule that some property owners cannot release or modify restriction without concurrence of other lot owners); *see also Smith v. Williams,* 422 S.W.2d 168, 173 (Tex.1967); *Farmer v. Thompson,* 289 S.W.2d 351, 355 (Tex.Civ.App.—Fort Worth 1956 writ ref'd n.r.e.).

We disagree that concurrence of other lot owners was required by the terms of the provision authorizing amend-

ment by Dyegard. *Scoville* involved a provision allowing unilateral amendment by the developer only until the first portion of the lots were sold. 784 S.W.2d at 501, 507 n. 5 (Ovard, J., dissenting) (noting that provision was in accord with settled rule that developer may only abrogate or modify plan ex parte *if no lots have been sold* ). The other cases discussed and relied upon by both parties in their briefs either involved dedications with no procedure for amendment or amendment provisions requiring a vote by a certain percentage or number of property owners. *Smith v. Williams*, 422 S.W.2d at 173 (noting no procedure provided, but owners of all property in subdivision rededicated land); *Couch*, 10 S.W.2d at 973 (holding authority vested in majority of owners to amend); *Hanchett*, 696 S.W.2d at 615 (holding concurrence of all required where no procedure provided for amendment); *Farmer*, 289 S.W.2d at 355 (holding one owner could not modify restrictions after all owners filed amended plat and dedication).

■ We also reject Appellees' contention that the covenants lacked a "method" for amendment. In *Baldwin v. Barbon Corporation*, paragraph 16 of the "Subdivision Restrictions" expressly reserved the developers' "right in their sole discretion to amend or alter these restrictions without the consent of the owners of lots in the Subdivision until such time as all lots ... are owned by others ... if it is, in the opinion of the [developers] for the best interest of all property owners." 773 S.W.2d 681, 682 (Tex.App.—San Antonio 1989, writ denied). Affirming a declaratory judgment for the developer allowing unilateral amendment by removal of a restriction, the court of appeals recognized the well established conditions for amendment of restrictions as listed above. *Id.* at 685. The court of appeals rejected the same argument made by Appellees here, holding that paragraph 16 "established the right of [the developer] to amend or alter *and the method* of so doing" and that removal of the restriction was within the developer's authority. *Id.* at 686 (emphasis added). Furthermore, although the plaintiff there acquired his tract in 1979 and the amendment removing the covenant was not executed until 1985, the court further noted that the plaintiff lot owner had "purchased his property subject to the Subdivision Restrictions which clearly included an express right of alteration or amendment." *Id.* at 686.

■ *Baldwin*, as well as other cases in Texas and other jurisdictions, recognize the validity of provisions reserving the unilateral right of the developer to amend, alter, or annul restrictive covenants.[11] However, this right continues only so long as the developer retains ownership in property within the subdivision. *Id.* at 684–85 (holding evidence sufficient to establish developer still retained ownership of lots in subdivision and, hence, had authority to amend covenants).

Courts in other jurisdictions that have considered the issue have held that, even where the unilateral right to amend or waive restrictions is expressly reserved,

11. 773 S.W.2d at 684–86; *e.g., Nelson v. Jordan*, 663 S.W.2d 82, 84–85 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (recognizing provision does not destroy mutuality of restrictive scheme); *see also Hall v. Gulledge*, 274 Ala. 105, 145 So.2d 794, 799 (1962) (rejecting traditional view that reservation of right by grantor to amend restrictions destroys mutuality of restrictions); *Matthews v. Kernewood*, 184 Md. 297, 40 A.2d 522, 526–27 (1945) (upholding grantor's reservation of the unilateral right to amend); *Bright v. Forest Hill Park Dev. Co.*, 133 N.J. Eq. 170, 31 A.2d 190, 194 (1943) (same); *Loch Haven Homeowners'* *Ass'n v. Nelle*, 389 So.2d 697, 698–99 (Fla. Dist.Ct.App.1980) (adopting view that reservation of right to amend is only one factor to consider in determining intent to establish plan of development); *see generally, Validity, Construction, and Effect of Contractual Provision Regarding Future Revocation or Modification of Covenant Restricting Use of Real Property*, 4 A.L.R.3d 570, 573, § 4(a) (1965) (noting various problems of interpretation arising in connection with the power to revoke or modify reserved to original owner, grantor, or subdivider).

the developer no longer retains that authority after divesting himself of all interest in the property. *E.g., Armstrong v. Roberts,* 254 Ga. 15, 325 S.E.2d 769, 770 (1985); *Richmond v. Pennscott Builders, Inc.,* 43 Misc.2d 602, 251 N.Y.S.2d 845, 850 (N.Y.Sup.Ct.1964); *Rossman v. The Seasons at Tiara Rado Assoc.,* 943 P.2d 34, 37 (Colo.Ct.App.1997); *Fairways of County Lakes v. Shenandoah Dev. Corp.,* 113 Ill. App.3d 932, 69 Ill.Dec. 680, 447 N.E.2d 1367, 1370 (1983). The reason for the rule, as explained in *Armstrong,* is that so long as the developer has an interest in the subdivision, his own economic interest will tend to cause him to exercise his right in a manner which will take into account harm to other lots in the subdivision. 325 S.E.2d at 770. Thus, there is "some economic restraint" against arbitrary action that is lacking once he has divested himself of all interest.[12] *Id.; see also Norwood,* 345 S.W.2d at 951 (Hughes, J., concurring) (expressing view that right to amend expired when developer divested itself of all ownership and citing general rule that a covenant attached to an estate cannot endure beyond the termination of the estate).

Those jurisdictions considering the issue impose an additional restriction on an amendment adopted by a developer pursuant to a reservation of the right to amend. Where equitable principles are invoked by seeking injunctive relief, an amendment must meet a standard of reasonableness and cannot be exercised in an arbitrary or capricious manner. *Armstrong,* 325 S.E.2d at 771; *see also Rossman,* 943 P.2d at 37; *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,* 303 So.2d 665, 666 (Fla.Dist.Ct.App.1974).

■ Appellees' motion for summary judgment did not address the issues of whether Dyegard retained ownership of any lots or whether the amendment was reasonable, nor does either party address those issues on appeal. Appellees' only complaint as to the validity of the amendment was the asserted lack of a "method" for amendment. The original covenants clearly reserved the right to amend and established the method for amendment by execution in writing and filing. The summary judgment evidence is uncontradicted that Dyegard followed this method in amending the original covenants. We conclude that Dyegard established its affirmative defense of modification of the original covenants by the amended covenants as a matter of law. We sustain Dyegard's third issue. However, because Dyegard did not file a cross-motion, we are unable to render judgment in its favor. *Taylor–Made Hose, Inc. v. Wilkerson,* 21 S.W.3d 484, 488–89 (Tex.App.—San Antonio 2000, pet. denied).

We affirm the summary judgment to the extent that it declares that the original covenants did not preclude plaintiffs from drilling water wells and reverse the summary judgment to the extent that it declares that the amended covenants did not preclude Plaintiffs from drilling water wells.[13] We remand this cause to the trial court for further proceedings in accordance with this opinion.

---

**12.** This reasoning is in accord with the rule that the original grantor has no authority to impose restrictive covenants when it has conveyed all interest in the property of the subdivision. *Davis v. Skipper,* 125 Tex. 364, 83 S.W.2d 318, 322 (1935); *Davis v. Huey,* 608 S.W.2d 944, 956–57 (Tex.Civ.App.—Austin 1980), *rev'd on other grounds,* 620 S.W.2d 561 (Tex.1981).

**13.** Because we are required to set aside the summary judgment and remand this cause for further proceedings, it is unnecessary to address Dyegard's fourth issue regarding whether the trial court erred in overruling its objections to Appellees' summary judgment evidence.